# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DONALD PEVIA,                          *

Plaintiff                              *

v                                      *           Civil Action No. ELH-18-3902

HOLLY PIERCE, NP, *et al.*,            *

Defendants                             *
                                      ***

## MEMORANDUM OPINION

Donald Pevia, a self-represented Maryland prisoner confined at the North Branch Correctional Institution ("NBCI"), filed suit under 42 U.S.C. § 1983 against Holly Pierce, N.P.; William Bill Beeman, R.N.; and Michael Klepitch, R.N. ECF 1.[1] He alleges that he was denied constitutionally adequate medical care. *Id.*

Defendants have moved to dismiss or, in the alternative, for summary judgment (ECF 20), supported by a memorandum (ECF 20-3) (collectively, the "Motion") and exhibits. Plaintiff opposes the Motion (ECF 27) and has submitted numerous exhibits, docketed collectively as ECF 27-1.[2] Defendants replied. ECF 29. Plaintiff filed an unauthorized surreply (ECF 32), which defendants have moved to strike. ECF 33. Plaintiff has also moved for an emergency injunction (ECF 26), which defendants oppose. ECF 30.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, defendants' Motion, construed as a motion for summary judgment, shall

---

[1] The Clerk shall amend the docket to reflect the correct names of defendants.

[2] The exhibits include a "Motion To Supplement." *See* ECF 27-1 at 38-44.

be granted.  Plaintiff's motion for an emergency injunction shall be denied.  Defendants' motion to strike shall also be denied.

## I.     Factual Background

### A.  Plaintiff

#### 1.  Complaint

Plaintiff alleges in his unverified Complaint that he suffered an injury to his left knee, which resulted in surgical repair on June 19, 2017.  ECF 1 at 1-2.  Although he healed from the surgery, Pevia suffers from "deteriorating joint disorder," bone spurs, and chronic arthritis in the knee, which is painful, causing a "crunching buckling at random."  *Id*. at 2. Plaintiff explains that when this happens the bones in his knee smash together, the knee becomes stiff, and this prevents him from moving outside of his cell, except to the shower and dayroom. *Id*.

On June 28, 2018, while on the floor of his cell, Pevia's cellmate fell from the top bunk on to plaintiff's left knee, smashing his knee into the concrete floor, and causing severe pain and swelling. *Id.* at 7.  Plaintiff submitted a sick call slip and was seen by medical staff on July 6, 2018. *Id*.  A few days later, on July 11, 2018, plaintiff was seen by Nurse Beeman. During the encounter, plaintiff requested a knee brace, explaining that his knee was both painful and unstable. *Id*.

Approximately one month later, on August 10, 1018, plaintiff was evaluated by Nurse Klepitch.  *Id*.  Plaintiff again inquired about a knee brace and also about having his bottom bunk status renewed.  *Id*.  Plaintiff  reported pain in the knee and difficulty climbing into the top bunk because he did not have a ladder or a chair. *Id*.

Klepitch again evaluated plaintiff on August 21, 2018.  *Id*.  Plaintiff reported  reinjuring his knee after his cell was flooded by another inmate.  Plaintiff's knee was measured for a knee brace. *Id.*

On an unknown date in September 2018, plaintiff saw Beeman, who was passing out medication, and asked about his knee brace. ECF 1 at 8. Beeman told plaintiff that the knee brace had been ordered but that it had not been passed out yet. *Id.*. Plaintiff asked Klepitch about the knee brace again on September 20, 2018, October 16, 2018, and October 23, 2018. *Id*.

Plaintiff's knee locked on November 19, 2018, and he could not straighten it. *Id.* Plaintiff's knee remained that way for three hours, until he forced it to straighten. *Id.* Pevia reports that his knee cracked and shifted as if it was dislocated and then put back in place. *Id*. His knee was "completely stiff, sore, and "tender to the touch." *Id.* He submitted a sick call slip. *Id.*

On November 29, 2018, Beeman was distributing medication when plaintiff stopped him, told him about the incident of his knee shifting, and asked him why he had not received the knee brace. *Id.* Beeman replied, "'You['re] not getting one, you['re] standing, so there's nothing wrong.'" *Id.* Beeman then walked away. *Id*. Plaintiff alleges that the failure to provide him with a knee brace puts him at a risk of harm with regard to his knee. *Id.* at 3.

Additionally, Pevia claims that he has not been provided with adequate pain medication. ECF 1 at 3. He states that aspirin and Tylenol do not treat his pain and, because he has been treated for Hepatitis C virus ("HCV"), these are the worst pain medications he could be prescribed, due to the damage these medications cause the liver. *Id*. Plaintiff states that Tramadol is the only chronic pain medication that is safe for the liver but he has been forbidden from having it. *Id*.

Plaintiff seeks an order that defendants provide him with a knee brace, bottom bunk paperwork, "medical cell paperwork be provided due to handrails being available," and pain medication that is adequate and liver friendly. ECF 1 at 4. He also requests compensatory and punitive damages. *Id.* at 11.

2.   Motion for Emergency Injunction[3]

In his Motion for Emergency Injunction (ECF 26), plaintiff alleges that a knee sleeve that he purchased from another inmate was confiscated by an unidentified officer.   ECF 26 at 1. Plaintiff alleges that there is no type of knee support available from the commissary, and he complains that inmates are not allowed to purchase knee devices from catalogues. *Id*. at 2.[4]  He also states that, even if he were allowed to purchase a knee sleeve from a catalogue, he is indigent and could not afford to do so. *Id*.   Further, Pevia contends that he can barely walk, due to the inflammation of his knee.  *Id*.

Further, plaintiff alleges that he found over-the-counter medication, which reduces the pain, but it is not sold in the commissary.  *Id*.  Plaintiff states that a friend of his who suffers from similar problems gave him ibuprofen 800 mg and Excedrin, which subdue the pain and the inflammation in his knee and shoulder, so that he can maintain his daily activities. *Id*.

Plaintiff also claims that medical cells provide grip bars but that medical providers, without justification, will not give him the paperwork so that he can be assigned to a  medical cell. *Id*.

In addition, Pevia  explains that "DJD is,  deteriorating joint disorder" where over time the joint deteriorates to the point where  joint replacement is the only option.  ECF 26 at 3.  He states that Roy Carls, M.D. diagnosed him as requiring a replacement of his shoulder joint but defendants fail to acknowledge the chronic shoulder and nerve damage he suffers.  ECF 26 at 3.

---

[3] Plaintiff previously filed a motion for temporary restraining order (ECF 6), seeking a knee brace, bottom bunk status, and pain medication.  The court denied the motion.  ECF 24; ECF 25. The Court found, in part, that plaintiff had access to a knee sleeve, analgesic pain medication, and was assigned to a bottom bunk. ECF 24.

[4] In his opposition to the Motion, plaintiff states that he purchased his own ace bandage. ECF 27 at 13.

B. Defendants

    1. The Motion

In support of their Motion, defendants submitted various exhibits, including the Affidavit of Holly Pierce, NP and relevant portions of plaintiff's medical records from January 10, 2018 through March 6, 2019. ECF 20-4 (medical records); ECF 20-5 (Pierce Affidavit).

Plaintiff has a medical history significant for HCV, hypertension, a surgically repaired torn ACL in his left knee, and left knee pain. ECF 20-5, ¶ 3.

Relevant to the allegations raised in this case, on January 12, 2018, plaintiff's laboratory results were received and his liver function tests were normal. He showed no sign of liver dysfunction. ECF 20-4 at 2-4.

Plaintiff submitted a sick call slip on January 28, 2018, complaining that he was suffering from nausea, body cramps, and pain since being "cut off." ECF 20-4 at 5. A note on the slip indicated that plaintiff had been seen by a provider on November 14, 2017,[5] and a tapering dose of Tramadol (Ultram) was prescribed. *Id*. Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain.[6]

NP Pierce evaluated plaintiff on February 2, 2018. ECF 20-4 at 6-7. Plaintiff demanded Tramadol and Baclofen.[7] He reported that his knee had been fine after his ACL repair in June of 2017, but it was reinjured when Pevia's cellmate fell on plaintiff's knee. *Id*. Pierce reviewed

---

    [5] The court previously addressed the discontinuation of plaintiff's Tramadol and Baclofen prescriptions in *Pevia v. Pierce*, Civil Action No. ELH-18-1553, ECF 19. In that case, I noted that in early 2018, when plaintiff's prescriptions for Tramadol and Baclofen were stopped, he was provided with Mobic at no cost. *Id*. at 7.

    [6] *See* https://www.drugs.com/tramadol.html (last visited February 6, 2020).

    [7] Baclofen is a muscle relaxer used to treat muscle symptoms such as spasms, pain, and stiffness. *See* https://www.drugs.com/baclofen.html (last visited February 6, 2020).

plaintiff's orthopedic notes with him, but plaintiff disagreed with the notes and became aggressive, causing Pierce to discontinue the visit due to concerns about safety. *Id*. Nevertheless, Pierce provided plaintiff with a prescription for 325 mg aspirin, 15mg Mobic,[8] and 500mg Tylenol ES to treat his pain. *Id*. The following day he was issued the medication as "KOP," *i.e.*, keep on person. *Id*. at 8; ECF 20-5, ¶ 8.

Pevia did not appear for his scheduled chronic care visit on March 11, 2018. But, he was seen in the recreation yard. ECF 20-4 at 9. He submitted sick call slips on April 16, 2018 and April 20, 2018, seeking to review his medical records. *Id*. at 10-11.

Pierce next evaluated plaintiff on June 25, 2018, in the chronic care clinic, for management of his hypertension. ECF 20-4 at 12-13. Pevia reported that he had not taken his blood pressure medication for several months. His blood pressure was 132/88 and regular blood pressure checks were ordered. A 2400 calorie diet order was also placed. *Id*. His HCV viral load was less than 12 with the infection described as stable. *Id*. The next day, the following prescriptions were entered: Tylenol, 500 mg, two tabs twice a day; Mobic, 15 mg, once a day in the morning; and aspirin, 325 mg, once per day. *Id*. at 66; ECF 20-5, ¶ 8. The prescriptions were issued as keep on person medications. ECF 20-5, ¶8.

Plaintiff filed a sick call slip on June 29, 2018, complaining that his left knee was swollen and reporting that his cellmate had fallen on his knee. ECF 20-4 at 15. However, plaintiff refused to be seen at sick call the following day. *Id*.

On July 4, 2018, plaintiff filed a sick call slip complaining that his blood pressure was high and he was suffering from nose bleeds and headaches. ECF 20-4 at 15. That same day he submitted

---

[8] Mobic (meloxicam) is a nonsteroidal anti-inflammatory drug that works by reducing hormones that cause inflammation and pain. *See* https://www.drugs.com/mobic.html (last visited February 6, 2020).

a second sick call slip, complaining that his left knee was swollen and claiming that this was the third sick call slip he had submitted regarding the pain in his knee. ECF 20-4 at 16. He submitted another sick call slip regarding knee pain on July 5, 2018. *Id.* at 17.

Pevia was seen on July 6, 2018, during nurse sick call, by Nurse Shively, who noted that plaintiff had active prescriptions for Tylenol, Mobic, and aspirin. *Id.* at 16, 18-19, 65. Plaintiff was described as walking into medical without difficulty and no swelling was observed on the left knee. *Id.* at 18-19. The nurse referred plaintiff to a provider. *Id.* Additionally, the nurse noted that the correctional officer stated that plaintiff had been placed on segregation for an altercation with another inmate. *Id.* [9]

Nurse Beeman saw Pevia on July 11, 2018. ECF 20-4 at 20-25. Plaintiff reported that his cellmate fell on his knee, resulting in knee pain that he described as a 5 on a 10-point scale. *Id.* He advised that he was "able to go up and down stairs, complete errands around the prison, complete cooking activities, able to dress himself, can squat and kneel to perform ADL's, stand from a seated position. Performs all ADL activities without [difficulty.]" *Id.* at 20. X-rays of the knee were ordered. *Id.* at 23, 25. The next day, Nurse Cortez was scheduled to see plaintiff for a blood pressure check but Pevia went to outdoor recreation instead. *Id.* at 27.

On July 16, 2018, the x-ray report was received. It showed no acute osseous abnormality but noted mild degenerative joint disease. ECF 20-4 at 26. Plaintiff was seen that day by Klepitch for a blood pressure check. *Id.* at 28.

Plaintiff filed sick call slips on August 6 and 7, 2018, requesting the renewal of unspecified paper work and seeking to discuss his shoulder injury and bowel movements. ECF 20-4 at 29-30.

---

[9] Plaintiff alleges that Shively misquoted the correctional officer regarding the basis for his placement on disciplinary segregation. He was placed on disciplinary segregation not because of a fight but because he was found in possession of a weapon. ECF 27 at 14-15.

He was seen by Klepitch on August 10, 2018. *Id.* at 31. Klepitch noted that plaintiff's front cuffing order expired on November 28, 2017, and there was no order for bottom bunk status. *Id*. In light of plaintiff's complaint regarding his bowel movements, Klepitch consulted with Pierce, who ordered that plaintiff be given 3 stool cards. *Id*. at 32. Klepitch referred plaintiff for follow up with a higher- level provider. *Id*.

Plaintiff submitted a sick call slip on August 18, 2018, seeking to see medical regarding "knee devices." ECF 20-4 at 34. He reported that he slipped and twisted his knee during a flood in his cell. *Id*. He was seen by Klepitch at nurse sick call on August 21, 2018. *Id*. at 35-36. Plaintiff was limping and favoring his left knee and swelling and pain were observed in the knee joint, along with a decreased range of motion. Plaintiff requested a knee sleeve and a bottom bunk order. Klepitch consulted with Pierce, who determined that neither a sleeve nor bottom bunk order was indicated. *Id.*

On September 16, 2018, plaintiff filed a sick call slip, complaining that his knee had been unstable for a month. ECF 20-4 at 38. He was seen by Klepitch twice on September 20, 2018, and each time he inquired about the status of his knee brace. However, Pevia did not appear in any distress and reported no other medical concerns. *Id.* at 39-42.

On October 13, 2018, plaintiff filed a sick call slip about his knee and back, complaining that he had previously submitted three sick calls about this issue, and he wanted a chair for his cell. ECF 20-4 at 43. He was seen by Klepitch on October 16, 2018, and was advised that security did not allow chairs. *Id.* at 45. Klepitch noted that plaintiff was fit and trim and he discussed plaintiff's condition with Pierce who again found that a bottom bunk order was not indicated. *Id.*

Pevia filed a sick call slip on October 22, 2018, complaining that he had not received a knee brace. ECF 20-4 at 47. He reported that his knee was swollen and buckling from jogging. *Id*.

8

He was seen the following day by Klepitch and complained of knee pain and decreased range of motion. *Id.* at 48. He was referred to a provider to review his x-rays. *Id.*

Plaintiff's prescriptions for Tylenol, aspirin, and Mobic expired on October 26, 2018. *Id.* at 66, 71. Plaintiff did not request a refill of any of the medications and they were not renewed in October 2018. ECF 20-5, ¶ 8.

On October 30, 2018, plaintiff filed a sick call slip indicating that he needed a CT scan because family members had been diagnosed with an aneurysm. ECF 20-4 at 51. The same day he submitted a second slip call asking to be seen about his shoulder and knee and claiming that his medications were damaging his liver. ECF 20-4 at 52. He stated that he had tried Tegretol and Cymbalta but they caused him unwanted side effects. *Id.*

Plaintiff was seen by Nurse Reese on November 6, 2018, who assessed plaintiff as desiring better pain medication. ECF 20-4 at 53. Reese determined that there was no clinical indication to refer him to a provider, and plaintiff was advised that over-the-counter pain medications could be purchased through the commissary. *Id.*

Klepitch saw plaintiff again on December 19, 2018, at sick call. ECF 20-4 at 55. Plaintiff wanted to sign off on his 2400 calorie diet, which he did. *Id.* Klepitch noted the knee brace issue had been resolved. *Id.*

On January 31, 2019, plaintiff filed a sick call slip regarding his knee and shoulder. He complained that the knee sleeve he bought from another inmate did not stop his knee from buckling. ECF 20-4 at 57. Plaintiff refused to be seen at nurse sick call on February 8, 2019. *Id.* at 58. He was, however, seen in the recreation yard, walking without difficulty. *Id.*

Plaintiff submitted a sick call slip on March 3, 2019, complaining, among other things, that his knee locked up to the point he could barely move. ECF 20-4 at 59. On March 6, 2019, he was

seen by Asresahegn Getachew, M.D., via telemedicine. *Id*. Dr. Getachew was assisted by Nurse Brant, who conducted the physical examination. *Id.* at 60. During that encounter, plaintiff did not complain to Dr. Getachew about any of the issues contained in his sick call slips. *Id*. at 59.

In his opposition to the Motion (ECF 27), plaintiff explains that he did not address his knee issues with Dr. Getachew because the visit was for his HCV and, because it was via telemedicine, there was no way for Dr. Getachew to examine his knee. ECF 27-1 at 39. Plaintiff's vital signs during the exam were normal. His hypertension was assessed as well controlled, his HCV was assessed as resolving, and it was noted that his most recent lab results were normal. *Id*. at 60-62.

Pierce explains that Klepitch and Beeman, as registered nurses, have no authority to diagnose plaintiff's medical condition. ECF 20-51 ¶ 5. Nor are they able to prescribe a knee brace or order bottom bunk status. *Id.*

In February and July of 2018, Pierce evaluated Pevia. During both encounters, plaintiff did not present with any clinical evidence indicating that a knee brace or bottom bunk order were medically necessary. ECF 20-5, ¶ 6. As such, Pierce did not order a knee brace or bottom bunk status for plaintiff. *Id*.

Plaintiff counters that Pierce did not physically examine him on these occasions, beyond asking him to bend and straighten his leg. He asserts that Pierce did not feel how his knee moved. ECF 27-1 at 39.

Pierce avers that in her opinion her decision was appropriate based on plaintiff's clinical presentation and medical history. ECF 20-5, ¶ 6. If plaintiff's condition changes and a knee brace or bottom bunk status becomes medically necessary, the appropriate order would be issued. *Id*. Additionally, Pierce clarifies that she has no specific knowledge whether a knee sleeve or brace

can be ordered through the commissary. Nevertheless, she asserts that plaintiff has no medical need for a knee brace or sleeve. *Id.*

According to Pierce, plaintiff's previous history for HCV, which has now resolved, does not mean that Tylenol or aspirin are contraindicated. ECF 20-5, ¶ 9. Rather, Pierce explains that the relevant issue is the amount of liver damage an HCV patient may have suffered and, given that plaintiff's liver function tests were within normal limits, the prescriptions for Tylenol and aspirin were appropriate. *Id.* However, Pierce acknowledges that large doses of Tylenol or aspirin can cause liver damage. Nevertheless, she claims that plaintiff was not prescribed a large dose of either medication and the doses prescribed have generally been found safe. *Id.* ¶ 10.

In regard to plaintiff's request for Tramadol (Ultram), Pierce explains that Tramadol is a synthetic opioid which may be habit forming with long-term use. Additionally, recent medical studies have shown that Tramadol works no better than placebos and worse than other available narcotics. ECF 20-5, ¶ 12. Moreover, Tramadol has been identified by the State Medial Director as a medication with patterns of abuse and overuse, including hoarding by inmates for improper use due to its narcotic-like effect, or for trade with other inmates. *Id.* ¶ 11. In order to address these abuses, Tramadol, absent special circumstances, should not be prescribed long term, as it is not for long-term pain relief. Additionally, the Center for Disease Control recommends non-pharmacologic therapy and non-opioid pharmacologic therapy for the treatment of chronic pain. *Id.* ¶ 13.

Pierce avers that plaintiff continues to have access to regular medical care through the chronic care clinic and sick call process. ECF 20-5, ¶ 14.

In his opposition to the Motion, plaintiff details, among other things, the issues surrounding his shoulder injury and his need for joint replacement surgery. ECF 27 at 4.[10] Pevia states that prior to Holly Pierce becoming the primary Nurse Practitioner to treat him, he was provided bottom bank paperwork and medical cell paperwork by Krista Swann, NP. *Id.* at 3. Additionally, he claims that since filing this law suit he filed three sick call slips but medical would not see him. him. *Id.* at 14. He also claims that Pierce failed to follow the sick call manual promulgated by the Department of Public Safety and Correctional Services ("DPSCS") regarding referral to a physician. *Id.* at 8. Additionally, he claims he needs a CT scan due to his fear that he is at risk for an aneurysm due to family history. ECF 27-1 at 42.

. To the extent that the opposition includes allegations not contained in the suit, the allegations may not be used to amend a complaint or add new claims. *See Zachair Ltd. v. Driggs,* 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd,* 141 F.3d 1162 (4th Cir. 1998); *Mylan Laboratories, Inc. v. Akzo, N. V.,*770 F. Supp. 1053, 1068 (D. Md. 1991), *aff'd,* 2 F.3d 56 (4th Cir. 1993). Accordingly, the court will not consider any new causes of actions asserted by plaintiff in submissions relating to motions.

2. Motion for Injunctive Relief.

Pierce again assessed plaintiff's knee on September 10, 2019. ECF 30-1 at 1-2 (Pierce Declaration), ¶ 4. Plaintiff reported instability and swelling in the left knee from playing basketball.

---

[10] Pevia is a frequent litigant in this Court. In Case ELH-13-3083, Pevia alleged a shoulder injury and the violation of medical orders for front handcuffing. *See id.*, ECF 1; ECF 3; ECF 5; ECF 15. I allowed the claim to proceed, appointed pro bono counsel for Pevia (ECF 39), and the case eventually settled. ECF 50; ECF 51; ECF 52.

He did not request a neoprene knee sleeve, as he had done before, but instead requested a stabilizing knee brace, which contains metal or hard plastic. *Id.*

The examination showed normal range of motion and contours of the joint as well as a normal gait, with no limp. ECF 30-1 at 4 (Medical Records). Pierce advised plaintiff that neither a knee brace nor sleeve was medically indicated for him. ECF 30-1 at 1, ¶ 4. To the contrary, in light of plaintiff's clinical assessment, a knee brace was not indicated because of the importance of increasing plaintiff's range of motion in the knee, which a brace would impede. *Id.*

According to Pierce, when an inmate is assessed by a medical provider as medically needing a knee brace, one is provided. ECF 30-1 at 1, ¶ 3. Pierce advised plaintiff to use ibuprofen and ice as needed for pain and swelling, to lose weight, and to avoid activities that increased discomfort. But, she ordered an x-ray of the left knee. ECF 30-1 at 4.

Moreover, plaintiff was provided a 30-count dosage of ibuprofen. ECF 30-1, ¶ 5. Inmates who are indigent may be provided over-the-counter medication when the medication is medically indicated. *Id.* Refill of plaintiff's ibuprofen would be subject to re-evaluation. *Id.*

Pierce avers that plaintiff's overall physical condition does not warrant a cell equipped with support bars to aid mobility. ECF 30-1 at 2, ¶ 6

John White, Correctional Case Manager II, avers in his Declaration (ECF 30-4 at 1-2) that he reviewed a video of plaintiff attending outdoor recreation on May 27, 2019, where plaintiff was on the basketball court and used his hands to lift another inmate by the inmate's feet to the basketball hoop. ECF 30-4 at 1, ¶ 4; *see* ECF 31-1 (filed separately). In the video, Pevia extended his hands over his head, while holding the inmate, so the inmate could sit on the basketball hoop. *Id. See*

On July 18, 2019, plaintiff was found with a homemade weapon hidden under an ace bandage wrapped around his left knee. ECF 30-3 at 4. The weapon was described as a 5" piece of plastic sharpened to a point on one end. *Id*. at 5. He waived his appearance before an Administrative Hearing Officer and pled guilty to the rule infraction. *Id*.

White explains that there have been times where medical staff issued medical devices to inmates which were then modified into contraband weapons used to injure staff. ECF 30-4 at 1, ¶ 3. White avers that a stabilizing knee brace, containing hard plastic parts, could be converted into a homemade weapon, thereby posing a security risk to staff and other inmates. *Id*.

At the time of defendants' response to the motion for injunction relief, plaintiff was not assigned to a top bunk. ECF 30-4 at 1, ¶ 5.

## II. Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. 2016) (per

curiam). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[11]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2015). However,

---

[11] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

"the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's

failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Plaintiff has not moved for discovery in response to the Motion. Moreover, he has submitted numerous exhibits to support his opposition. As such, I am satisfied that it is appropriate to address defendants' Motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence

in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Moreover, the trial court may not make credibility determinations on summary judgment. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323-24).

### III. Discussion

A. Section 1983

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit

against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 135 S. Ct. 1983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.");

*see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

B. Eighth Amendment

Plaintiff's claims regarding denial of medical care are governed by the Eighth Amendment to the United States Constitution, which prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). The Eighth Amendment "proscribes more than physically barbarous punishments." *Estelle*, 429 U.S. at 103. Of relevance here, it also "embodies" the "'concepts of dignity, civilized standards, humanity, and decency . . . .'" *Id.* at 102 (citation omitted). Thus, the Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). And, the Eighth Amendment imposes "certain basic duties on prison officials,"

such as requiring "reasonable measures to guarantee the safety of the inmates." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016). Therefore, "[s]crutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

Notably, "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986)). In general, the deliberate indifference standard applies to cases alleging failure to safeguard an inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Thompson*, 878 F.3d at 97. And, "It is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'" *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (citation omitted).

The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (2017) (quoting *Farmer*, 511 U.S. at 834, 837-38).

For a plaintiff prisoner to prevail in a suit alleging the denial of adequate medical care, the defendant's actions or inaction must amount to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "The necessary showing of deliberate indifference can be

manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care." *Formica v. Aylor,* 739 F. App'x 745, 754 (4th Cir. 2018) (emphasis in *Formica*).

Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and, subjectively, the defendant was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer*, 511 U.S. at 837; *Schilling*, 937 F.3d at 357; *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *King*, 825 F.3d at 219. A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228.

The Court explained in *Heyer v. United States Bureau of Prisons*, 649 F.3d 202, 209-10 (4th Cir. 2017): "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." In the context of a claim concerning medical care, the subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225.

Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837. The Fourth Circuit has said: "True subjective recklessness requires

knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see Young v. City of Mount Ranier,* 238 F.3d 567, 575-76 (4th Cir. 2001) ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care.").

Put another way, "it is not enough that the defendant *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*); *see also Anderson v. Kingsley*, 877 F.3d 539, 544 (4th Cir. 2017). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial *risk* of serious harm.'" *Heyer*, 849 F.3d at 210 (quoting *Farmer*, 511 U.S. at 837) (emphasis added in *Heyer*); *see Thompson*, 878 F.3d at 97-98. But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014); *see De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013).[12]

---

[12] The Supreme Court has rejected the "significant injury" requirement in regard to an excessive force claim under the Eighth Amendment. *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010) (per curiam); *see Danser*, 772 F.3d at 346 n.8 (distinguishing deliberate indifference claims).

Of relevance here, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *accord Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001). The Constitution requires prison officials to ensure "reasonable safety," a standard that acknowledges prison officials' "unenviable task of keeping [sometimes] dangerous [people] in safe custody under humane conditions[.]" *Id.* at 845 (citations and quotation marks omitted). Accordingly, "prison officials who act reasonably cannot be found liable" under the deliberate indifference standard. *Id.*; *see also Short v. Smoot*, 436 F.3d 422, 428 (4th Cir. 2006) (finding that an officer who responds reasonably to a danger facing an inmate is not liable under the deliberate indifference standard, even when further precautions could have been taken but were not); *Stritehoff v. Green*, CCB-09-3003, 2010 WL 4941990, at *3 (D. Md. Nov. 30, 2010) ("An officer who responds reasonably to 'the risk of which he actually knew' is not liable for deliberate indifference.") (quoting *Brown*, 240 F.3d at 390-91).

It is also salient that deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). In *Estelle*, 429 U.S. at 106, the Supreme Court said: "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Similarly, what the Fourth Circuit said in *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), *cert. denied,* 529 U.S. 1067, (2000), is pertinent: "Deliberate indifference is a very high

standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . ." *See also Young*, 238 F.3d at 576 (stating that a Fourteenth Amendment deliberate inference claim requires more than a showing of "mere negligence"); *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998) ("[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference.").

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842); *see Schilling*, 937 F.3d at 357 (recognizing that a defendant's "subjective knowledge can be proven 'through direct evidence of [his] actual knowledge or circumstantial evidence tending to establish such knowledge . . . .'") (quoting *Scinto*, 841 F.3d at 225).

If a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice*, 58 F.3d at 105. But, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d

560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012); *Lopez v. Green*, PJM-09-1942, 2012 WL 1999868, at * 2 (D. Md. June 3, 2012); *Robinson v. W. Md. Health Sys. Corp.*, DKC-10-3223, 2011 WL 2713462, at *4 (D. Md. July 8, 2011).

Here, the evidence, viewed in the light most favorable to plaintiff, establishes that he received constitutionally adequate medical care. As to plaintiff's complaints regarding the denial of analgesic pain medication, the record demonstrates that plaintiff was taken off of Tramadol based on concerns about its long-term use and lack of clinical efficacy for his condition. Similarly, plaintiff's prescription for Baclofen was also discontinued. However, plaintiff was provided at various times with Tylenol, aspirin, ibuprofen, and Mobic. Although the over-the-counter medications are available for purchase through the commissary, where plaintiff was able to demonstrate his indigency, and the over-the-counter medications were clinically indicated, they were provided to him, without change. Mobic, a prescription medication, was also provided. When plaintiff's prescriptions expired, he did not file any sick call slips seeking their renewal. Moreover, in light of the stability of plaintiff's HCV status and his normal liver function, the medications prescribed were not contra-indicated, as Pevia alleges.

Regarding Pevia's claims that he was denied adequate medical care due to defendants' failure to provide him with a knee brace, bottom bunk status, or a medical cell, his claim likewise fails. Plaintiff was regularly seen by medical staff due to his complaints of knee pain caused by mild degenerative joint disease as well as trauma to the knee from his cellmate falling on his knee, twisting the knee while cleaning his cell, and injuring the knee during recreation. Plaintiff was examined, provided analgesic pain medication, and given diagnostic testing. Medical staff determined that none of the requested accommodations he sought were medically indicated.

Further, throughout this period of time, plaintiff was observed by staff and self-reported engaging in sports, sometimes to the exclusion of attending his medical visits.

It is unrefuted that Nurses Beeman and Klepitch were without authority to provide any of the relief plaintiff sought. But, they provided the treatment they could offer and referred plaintiff to a provider for further evaluation. Pierce, who examined plaintiff on at least three occasions and consulted with other providers on occasion, determined that the requested orders were not clinically indicated. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)).

Viewing the evidence as a whole, in the light most favorable to plaintiff, no evidence exists that the alleged conduct amounted to deliberate indifference on behalf of any of the named providers. Defendants are entitled to summary judgment.

C. Preliminary Injunctive Relief

Plaintiff is not entitled to injunctive relief. A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren,* 553 U.S. 674, 689–90 (2008). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual

and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).

In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). For the reasons discussed above, plaintiff has failed to demonstrate the likelihood of success on the merits and, for this reason, his request for injunctive relief must be denied. Moreover, plaintiff has also failed to demonstrate that he is likely to suffer irreparable harm or that the balance of equities tips in his favor.

## IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment will be GRANTED and judgment will be ENTERED in favor of defendants and against plaintiff. A separate Order follows.

February 13, 2020
Date

_____/s/_____
Ellen L. Hollander
United States District Judge